## CONTINUATION OF SEARCH WARRANT

I, Alex Travers, being duly sworn, do hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property: 1) – an electronic device – which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B-1, 2) – two (2) knives – which are currently in law enforcement possession and are more thoroughly described in Attachment B-2, and 3) – clothing items, which are currently in law enforcement possession and are more thoroughly described in Attachment B-3.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2022. I am currently assigned to the Detroit Division, Marquette Resident Agency. Prior to my employment with the FBI, I was a police officer for over eight (8) years in Cranston, Rhode Island where I served as a patrol officer, in temporary assignments with the department's Special Investigations Unit, and as a patrol sergeant.

3. I submit that this continuation shows there is probable cause to believe that Kyle Dean committed the crimes of 18 U.S.C. § 113(a)(3), 1151, 1153, assault with a dangerous weapon, and 18 U.S.C. § 113(a)(6), 1151, 1153, assault resulting in serious bodily injury. Further, I submit that there is probable cause to believe that evidence, as defined in Attachments B-1, B-2, and B-3, will be found on 1) the

1

**SUBJECT DEVICE** further described below and in Attachment A-1, 2) two (2) knives further described below and in Attachment A-2, and 3) clothing further described below and in Attachment A-3.

4. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This continuation is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE ITEMS TO BE EXAMINED

5. I seek this search warrant to search the cell phone (**SUBJECT DEVICE**) in the possession of Kyle Dean on January 20, 2024. **SUBJECT DEVICE** is a smart cellular telephone, pictured below, with a "Higher Love" sticker affixed to the back. The **SUBJECT DEVICE** was seized by L'Anse Village Police Department (LVPD) from the Residence (a known address within the exterior boundaries of the L'Anse Reservation of the Keweenaw Bay Indian Community). I later took custody of the **SUBJECT DEVICE** at Baraga County Memorial Hospital (BCMH). Based on my training and experience, I secured and maintained the **SUBJECT DEVICE** in a manner such that the phone's contents are the same as when it was seized. Based on the information outlined below, there is probable cause to believe that evidence of the crimes under investigation will be found on the **SUBJECT DEVICE**.

2



6.     The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B-1.

7.     I seek this search warrant to seize and search the two (2) knives in the possession of Kyle Dean on January 20, 2024.  Dean provided the knives to Baraga County Memorial Hospital (BCMH) staff. The knives were collected by law enforcement at BCMH and remain secure in the custody of KBTP. Based on the information outlined below, there is probable cause to believe that evidence of the crimes under investigation will be found on the knives.

8.     The applied-for warrant would authorize the forensic examination of the knives for the purpose of identifying evidence particularly described in Attachment B-2.

9.     I seek this search warrant to seize and search clothing items worn by

3

Kyle Dean on January 20, 2024. Dean was arrested by KBTP and lodged at Baraga County Jail (BCJ) on January 20, 2024. Dean changed into clothing issued by the BCJ, who secured the clothing he had been wearing. Dean's clothing was subsequently transferred to the custody of KBTP.

10. The applied-for warrant would authorize the forensic examination of the Dean's clothing for the purpose of identifying evidence particularly described in Attachment B-3.

## PROBABLE CAUSE

11. On January 20, 2024, LVPD and the KBTP received a 9-1-1 report of an individual with multiple stab wounds. Officers arrived on scene and found Victim in the entry way of their Residence with multiple stab wounds. Witness was with Victim when officers arrived and had made the original call to 9-1-1.

12. The audio file from the 9-1-1 call made by Witness was captured and saved. During the call, Witness named Victim in the recording, and said Victim was stabbed by Kyle Dean. Dean was described as wearing a black "hoodie or jacket. Officers arrived at the Residence and found Victim on the ground, with Witness and Minor Witness nearby. Outside the residence, the **SUBJECT DEVICE** was found on the ground along with several articles of clothing, and a red substance that appears consistent with blood.

13. While officers were on scene at the Residence, they received a report that Dean admitted himself to BCMH. Dean had a cut on his hand and told staff at the hospital that he stabbed someone. Dean told an employee of the hospital that he

4

"stabbed (Victim) ten times". When Dean arrived at BCMH, he provided two (2) knives to hospital staff, one of which appeared to contain a substance consistent with blood. Investigators went to the hospital, took custody of the knives from hospital staff, and spoke with Dean.

14. Below is a screenshot of an officer's body camera footage of the knife with the substance consistent with blood. Police described the knife as having a two (2) and a half to three (3) inch blade. Based on my training and experience, I believe that this knife qualifies as a dangerous weapon. I am informed by the United States Attorney's Office that a weapon qualifies as a dangerous weapon under 18 U.S.C. § 113(a)(3) if it either is inherently dangerous (e.g., is a knife) or is used in a manner that is likely to endanger life or inflict great bodily harm.



15. Dean told an officer of the KBTP that he went to the Residence to see his son. Victim met Dean at the door, and Dean pulled out his **SUBJECT DEVICE** to show Victim a video. Dean told the officer that Victim punched him and Dean stabbed Victim. Dean believed that he cut his hand when the blade slipped.

16. An officer from KBTP spoke with Victim while at BCMH. Dean had posted on Facebook about "Gangstalking" him. Victim told the officer that Dean came

5

to the Residence and tried to enter the house. Victim told him to leave, and Victim pushed Dean away. Dean pushed Victim back, and Victim punched Dean. Dean went down to the ground, and Victim again told him to leave. Dean retrieved a knife off his person and stabbed Victim. Victim continued to punch Dean as the fight continued down the driveway, towards the road.

17. I reviewed medical records from BCMH, where physicians did a preliminary review of Victim before sending him to UPHS for a higher level of care. According to the records, Victim sustained multiple (approximately eight to eleven) stab wounds of the chest, abdomen, and scalp. Based on my training and experience, the wounds will result in scarring, which I am informed by the United States Attorney's Office qualifies serious bodily injury because it will result in protracted and obvious disfigurement. FBI has requested medical records from the examining medical facility (UPHS), but the medical facility has not thus far produced the records.

18. Special Agent Richard Grout and I interviewed Dean at BCMH. Dean said he went to Victim's Residence to see his son. He arrived and wanted to show Victim a video on Facebook of someone staring at the back of Dean's truck and made reference to "Gangstalkers."

19. After Dean was treated at BCMH, he was arrested on tribal charges by KBTP and taken to BCJ. At the jail, Dean changed into jail issued clothing. BCJ then secured the clothing Dean had been wearing. The clothing has since been transferred to the custody of KBTP. I believe that Dean's clothing worn at the time of the

6

altercation is likely to contain blood and/or deoxyribonucleic acid (DNA) of the Victim, Dean, or both, which will constitute evidence of the crimes under investigation.

20. At Upper Peninsula Health System – Marquette Hospital, Witness spoke with Special Agent Johnathan Trent and Special Agent Richard Suda. Dean came to the house in his truck and entered through the front door. Victim exited the house and met Dean in a room between the two doors. Witness heard Dean ask Victim to look at a video, and Dean and Victim went towards Dean's truck. Dean and Victim started fighting, and the fighting carried on down the driveway towards the road. When Victim returned to the Residence he asked Witness to call 9-1-1, and stated he/she had been stabbed by Dean.

21. A Minor Witness was in the residence at the time of the assault and can be heard during the 9-1-1 call made by Witness.

22. Based on the totality of the circumstances, including Dean's previous threats toward the Victim, Dean going to the Victim's residence with a knife, and Dean's action of stabbing Victim approximately eight to eleven times with the knife, I believe that Dean stabbed Victim with the intent to do bodily harm to Victim.

23. The **SUBJECT DEVICE** has been maintained in a manner so that the contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICE** first came into the possession of LVPD and FBI.

24. Witness informed investigators that Dean had made threats against Witness and Victim in the past. Witness provided investigators with audio files of

7

voicemails. Witness said these were voicemails that Dean left for Witness.

25. One of the voicemails provided by Witness was dated July 17, 2023. In the voicemail, a male's voice, whom I believe to be Dean, referenced a nickname of Victim. Dean stated, "…(Witness) brought (Victim) into this family and I'm going to fucking end him anyway…". Based on my training and experience, there may be evidence on the **SUBJECT DEVICE** of those phone calls being made, including call detail records.

26. Investigators located a Facebook profile with the display name "Kyle Dean". I believe that the Facebook post in the below image is the incident that Dean referenced when speaking with investigators:



27. Investigators located a Facebook post referencing a name which I believe to be a reference to Victim. I have redacted the name to protect the identity of Victim:

9



28.     Based on my knowledge, training, and experience, I know that Facebook has a mobile application in which users can access Facebook from their cell phones. Additionally, I know that accessing Facebook through the mobile application is a popular way that users utilize the platform.

## **TECHNICAL TERMS**

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log,"

10

which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or

iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13

30. Based on my training, experience, and research, I know that the **SUBJECT DEVICE** has capabilities that allow them to serve as a wireless telephone and portable media player. Further based on my training and experience, most smartphones have the capability to operate as a GPS navigation device and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. *Forensic evidence.* As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the

15

device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AUTHORITY TO OBTAIN BIOMETRIC CHARACTERISTICS

35. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a

16

combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

    d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

    e. As discussed in this affidavit, one **SUBJECT DEVICE** was seized. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

    f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the

    device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

36. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

37. I submit that this continuation supports probable cause for a search warrant authorizing the examination of the 1) **SUBJECT DEVICE** described in Attachment A-1 to seek the items described in Attachment B-1, 2) two knives described in Attachment A-2 to seek the items described in Attachment B-2, and 3) clothing items described in Attachment A-3 to seek the items described in Attachment B-3.